## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| ADELE E., | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| v. | ) | CIVIL NO. 2:15-cv-01-DBH |
| | ) | |
| ANTHEM BLUE CROSS AND BLUE | ) | |
| SHIELD, | ) | |
| | ) | |
| DEFENDANT | ) | |

## DECISION AND ORDER ON CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

On this judicial review of an insurance carrier's decision to deny benefits under a group employee health plan, the issues are, first, the standard of review and, second, whether the denial of benefits should be sustained. Both parties have moved for judgment on the administrative record.[1]  I conclude that review is de novo and that the insurance carrier erred in denying benefits.

### BACKGROUND

The plaintiff Adele E. is a resident of Maine who was attending college in Colorado.  R. at 375.  Through her father, she was a covered beneficiary under a group employee health plan ("Plan").  R. at 1551.  Anthem Blue Cross and Blue Shield ("Anthem") insured benefits under the Plan through a Certificate of Coverage ("Certificate").  R. at 1551-1659.  The parties have stipulated that the

---

[1] Citations to the administrative record (using the "DEF #" pagination) are reflected as "R. at [page number]."

Certificate of Coverage is the authoritative Plan document and that Anthem is the Administrator for the Plan.  See Stipulation of the Parties in Resp. to the Procedural Order dated March 22, 2016 at 1 (ECF No. 39).

At the time of Adele E.'s claim for Plan benefits, she had a history of severe mental illnesses, including bulimia nervosa and obsessive compulsive disorder. R. at 377-416.  On May 29, 2012, she was admitted to RainRock Treatment Center ("RainRock") in Eugene, Oregon, to address these issues.  R. at 377. Initially, Anthem determined that she met the criteria for Residential Treatment Center ("RTC") level of care under the Plan and Certificate, and approved her claim for residential treatment benefits for twenty days, May 29, 2012 to June 17, 2012.  R. at 227-228.  On June 18, 2012, Anthem denied her claim for further benefits because "[t]he information your provider gave us does not show that [residential treatment] is medically necessary."  R. at 4-7.  She nevertheless remained at RainRock until October 29, 2012, when she was discharged after having made "tremendous progress [with] her [eating disorder] management [and was] hopeful regarding full recovery."  R. at 373, 418-419.  After her discharge, she appealed Anthem's denial of benefits.  R. at 260-685, 1086-1550.  At two appeal levels, Anthem upheld the denial.  R. at 686-688, 1025-1027.  Adele E. then filed this federal lawsuit challenging the benefits denial.

### JURISDICTION

This is a claim under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. §§ 1001-1461 (2009 & Supp. 2015).  Federal courts

have subject-matter jurisdiction over ERISA claims.  Id. § 1132(a)(1)(B), (e); 28

U.S.C.A. § 1331 (2006 & Supp. 2015).

### STANDARD OF REVIEW[2]

In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the Supreme

Court held that judicial review of benefits denial is de novo, "unless the benefit

plan gives the administrator or fiduciary discretionary authority to determine

eligibility for benefits or to construe the terms of the plan."  Id. at 115 (referring

to review under 29 U.S.C.A. § 1132(a)(1)(B)).  If the plan does grant discretionary

authority, then according to the Supreme Court and the First Circuit "the claims

administrator's decision will be upheld unless it is arbitrary, capricious, or an

abuse of discretion."  Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue,

Inc., 813 F.3d 420, 427 (1st Cir. 2016); Firestone, 489 U.S. at 115.

Here, Anthem's Certificate of Coverage explicitly gives the administrator

discretionary authority to determine eligibility for benefits:

> We, or anyone acting on our behalf, *have complete discretion
> to determine* the administration of your Benefits.  *Our
> determination shall be final and conclusive* and may include,
> without limitation, determination of whether the services,
> care, treatment, or supplies are Medically Necessary . . . .

R. at 1622 (emphasis added).  That language seems to place it within Firestone's

and Stephanie C.'s deferential review category.  But section 4303(11) of Maine's

Insurance Code states that

> [a] policy, contract, certificate or agreement offered . . . in
> this State by a carrier to . . . reimburse any of the costs of
> health care services *may not contain a provision purporting to*

---

[2] On the standard of review, I have consulted not only the parties' motions and responses on
their cross-motions for judgment on the administrative record, but also their written arguments
on the plaintiff's earlier motion to modify the administrative record and for discovery.

> *reserve sole or absolute discretion to the carrier* to interpret
> the terms of the contract or to provide standards of
> interpretation or review that are inconsistent with the laws
> of this State.

24-A M.R.S.A. § 4303(11)(A) (2015) (emphasis added).   Thus, if Anthem's

provision means what it says about complete discretion that is final and

conclusive, then the provision does not belong in the Certificate; instead, it is

invalid under Maine law,[3] and as a result, <u>Firestone</u> makes judicial review de

novo.   On the other hand, the discretionary provision in the Certificate goes on

to say: "However, you may utilize all applicable Complaint and Appeal

procedures, as outlined later in this section," R. at 1622, and at another point

the Certificate refers to a beneficiary's right to an "external review" by the Maine

Bureau of Insurance under another Maine statute, R. at 1576; <u>see</u> 24-A M.R.S.A.

§ 4312 (2015).   So does the Anthem Certificate contain a provision that grants

Anthem "*sole or absolute discretion*" such that the clause is invalid in Maine?

The beneficiary Adele E. says yes, Pl.'s Mot. for J. on the Admin. R. at 13-15

---

[3] Part B of the same subsection states:

> A carrier *may not enforce* a provision in a policy, contract,
> certificate or agreement that was offered, delivered or issued for
> delivery in this State and has been continued or renewed by a
> group policy holder or individual enrollee in this State that
> purports to reserve sole or absolute discretion to the carrier to
> interpret the terms of the contract or to provide standards of
> interpretation or review that are inconsistent with the laws of this
> State.

24-A M.R.S.A. § 4303(11)(B) (emphasis added).   I follow the circuit cases (there is no case
from the First Circuit) that hold that ERISA does not preempt such state legislation.   <u>See</u>
<u>Fontaine v. Metro. Life Ins., Co.</u>, 800 F.3d 883, 885 (7th Cir. 2015); <u>Standard Ins. Co. v.</u>
<u>Morrison</u>, 584 F.3d 837, 849 (9th Cir. 2009); <u>Am. Council of Life Insurers v. Ross</u>, 558
F.3d 600, 609 (6th Cir. 2009).   <u>But cf.</u> <u>Hancock v. Metro. Life Ins. Co.</u>, 590 F.3d 1141,
1149 (10th Cir. 2009) (Utah rule that, unlike Maine, did "not remove the option of insurer
discretion from the scope of permissible insurance bargains in ERISA plans," but merely
regulated how such clauses were to be worded and printed, had no impact on risk-pooling
agreements, and therefore failed to satisfy the two-prong test of <u>Kentucky Ass'n. of Health</u>
<u>Plans, Inc. v. Miller</u>, 538 U.S. 329, 342 (2003), for avoiding ERISA preemption).

(ECF No. 33) ("Pl.'s Mot."), and that judicial review is therefore de novo.  Anthem says no—that the availability of independent external review by the Bureau of Insurance means that Anthem does *not* have in its Certificate a clause that gives it "sole or absolute" discretion, Def.'s Mot. for J. on the Admin. R. at 3-6 (ECF No. 32) ("Def.'s Mot.")—and that Anthem's adverse decision therefore should receive deference under Firestone.  Id. at 6.[4]

In 2000, Maine enacted the independent external review statute on which Anthem relies—section 4312, enacted as part of "An Act to Establish a Patient's Bill of Rights."  P.L. 1999, ch. 742, § 19.  The 2000 legislation gave an enrollee "the right to an independent external review" of an "adverse health care treatment decision" and established procedures for how to request such a review. 24-A M.R.S.A. § 4312.  The statute also instructed that external review was to be conducted under Maine Bureau of Insurance oversight.   Id. § 4312(4). According to the statute, the external review decision is binding on the carrier, but not on the enrollee.  Id. § 4312(6).  Moreover, the statute requires the carrier to "notify an enrollee of the enrollee's right to request an external review in large

---

[4] Adele E. did not seek external review.  But Anthem has not argued that external review is a prerequisite to her seeking relief in this court.  Neither the language of the statute nor the rule adopted by the Maine Bureau of Insurance discussed *infra* suggests that an enrollee or beneficiary must seek external review before she can bring an ERISA claim in federal court.  The only source that does in fact suggest such an exhaustion requirement is a brochure available on the Maine Bureau of Insurance's website, which states that an enrollee "can take further private legal action . . . only after exhausting all the appeals available to you, including the external review."  Maine Bureau of Insurance, *Guide to Requesting an Independent External Review for Health Insurance*, MAINE.GOV,  http://www.maine.gov/pfr/insurance/consumer/pdf/External_Review.pdf (last visited April 26, 2016).  That statement, however, could be directed at the exhaustion requirement explicitly contained in section 4313, which created a state cause of action for enrollees to sue their carriers for various kinds of damages.  See 24-A M.R.S.A. § 4313(2) (2015) ("An enrollee may not maintain a cause of action under this section unless the enrollee . . . [h]as exhausted all levels of the carrier's internal grievance procedure . . . and [h]as completed the independent external review process required under section 4312.").

type and easy-to-read language in a conspicuous location." <u>Id</u>. § 4312(3).   The

Maine Bureau of Insurance adopted rules to carry out the requirements of

section 4312.   <u>See</u> 02-031 C.M.R. ch. 850 (2002).   Among other things, the rules

directed that "[n]otice of external review rights must be provided to the enrollee

as required by 24-A M.R.S.A. § 4312(3)." <u>Id</u>. § 8(G)(1)(c)(v) (now codified at

02-031 C.M.R. ch. 850, § 8(G)(1)(c)(vii) (2015)).[5]

Then in 2003, Maine added its prohibition on discretionary clauses, three

years *after* it had enacted the provision for independent external review.   The

language of the 2003 statute is as follows:

> **11**. **Absolute discretion clauses.** The use and enforcement
> of an absolute discretion clause is governed by this
> subsection.
>
> > **A.** A policy, contract, certificate or agreement offered,
> > delivered, issued or renewed for delivery in this State by a
> > carrier to provide, deliver, arrange for, pay for or reimburse
> > any of the costs of health care services may not contain a
> > provision purporting to reserve sole or absolute discretion to
> > the carrier to interpret the terms of the contract or to provide
> > standards of interpretation or review that are inconsistent
> > with the laws of this State.
> >
> > **B.** A carrier may not enforce a provision in a policy,
> > contract, certificate or agreement that was offered, delivered
> > or issued for delivery in this State and has been continued
> > or renewed by a group policy holder or individual enrollee in
> > this State that purports to reserve sole or absolute discretion
> > to the carrier to interpret the terms of the contract or to

---

[5] Most of the legislative history to the statutes at issue in this case are available on the Maine Legislature's website at <u>http://legislature.maine.gov/lawlibrary/legislative-history/9211</u>.   <u>See generally</u> P.L. 1999, ch. 742, § 19 (and corresponding legislative history); L.D. 750 (119th Legis. 1999) (and majority and minority reports for committee review, and multiple committee amendments debating the right-to-sue provision in section 4313 and the amount of damages a claimant could recover).   Section 4312 has been amended three times since its enactment in 2000, but not in any substantive way that affects my analysis here.   <u>See</u> P.L. 2007, ch. 199, § B-17 (emergency, effective May 31, 2007) (making requirements for renewing a policy consistent with the law relating to participation requirements at the time a policy was issued); P.L. 2011, ch. 364, §§ 31, 32 (bringing the external review process into compliance with the Federal Patient Protection and Affordable Care Act); P.L. 2013, ch. 274, § 1 (adding a subsection on the confidentiality of external review records).

> provide standards of interpretation or review that are
> inconsistent with the laws of this State.

24-A M.R.S.A. § 4303(11).   Maine enacted section 4303(11) in response to national model legislation.   In 2001, the National Association of Insurance Commissioners ("NAIC") drafted a Model Act entitled the "Prohibition on the Use of Discretionary Clauses" to clarify to "states that they possess[ed] the authority to prohibit [discretionary] clauses in insurance contracts."   NAIC, 2001 Proc. 4th Quart. Vol. I, 214.   In 2002, the NAIC adopted the Model Act.   NAIC, 2002 Proc. 1st Quart. Vol. I, 7.   The legislative history of section 4303(11) in Maine is full of references to the NAIC Model Act[6] and demonstrates that the Maine Legislature was concerned that "these [discretionary] clauses put consumers at [a] disadvantage when seeking to overturn [the] denial of benefits."   Office of Policy and Legal Analysis to the Joint Standing Committee on Insurance and Financial Services, L.D. 316 (121st Legis. 2002) (summary of proponents and opponents of the bill).[7]   Both proponents and opponents of the bill's enactment presented detailed testimony to the Legislature.   Opponents of the bill highlighted that

> the intent of [the] Model Act would be to make *all benefit
> denials subject to de novo review* by a federal court.   While
> the Model Act cannot determine the standard of review for
> federal courts, *the absence of 'discretion' would mean that the
> initial Firestone standard of de novo review would always be*

---

[6] The NAIC Model Act and section 4303(11) are nearly identical, save for the language "absolute" in the heading of the subsection and the phrase "sole or absolute" modifying "discretion" in the body of the statute.   The changed language, however, was present in the original Legislative Document and before proponents and opponents of the bill testified for and against its enactment.   Nothing in the legislative history suggests that this wording difference substantively altered the Model Act's prohibition.

[7] The Law Court examines legislative history and other indicia of legislative intent when interpreting ambiguous statutory provisions.   See Thurston v. Galvin, 2014 ME 76, ¶ 13, 94 A.3d 16, 20; Maine Ass'n of Health Plans v. Superintendent of Ins., 2007 ME 69, ¶ 35, 923 A.2d 918, 928.

> *applied* and any reasonable findings or conclusions of the
> plan administrator would be ignored.

Summary from the Health Insurance Association of America against L.D. 316 (121st Legis. 2002) (detailing intent and consequences of NAIC's Model Act) (emphasis added).[8]  There was no reason for that concern about de novo judicial review if in fact section 4312 had the effect that Anthem urges here.  Yet nowhere in the debate is there any suggestion that 2003's new prohibition on discretionary clauses was unnecessary or redundant because claimants already had the ability to seek de novo review by the external review procedures codified in section 4312.[9]

---

[8] See generally P.L. 2003, ch. 110, § 1 (and corresponding legislative history); L.D. 316 (121st Legis. 2003) (testimony and submissions); Comm. Amend. A to L.D. 316, No. H-118 (121st Legis. 2003) (codified at 24-A M.R.S.A. § 4303(9) (2003) (later relocated to subsection 11)).  The debate in Maine regarding discretionary clauses was not unique.  In the years following Firestone, employee benefit plan administrators regularly inserted discretionary clauses into governing plan documents to secure the highly deferential "arbitrary and capricious" standard of review in evaluating a denial of benefits.  See D. Andrew Portinga, OFIS Bans Discretionary Clauses in Insurance Policies, 1 J. INS. & INDEM. L. 1, 11 (2008) ("After Firestone, insurers commonly inserted discretionary clauses into ERISA-regulated policies.  These clauses limit a federal court's review of an insurer's decision to deny benefits in ERISA cases.").  In response, a number of states began regulating insurance contracts in an attempt to limit or ban the use of these clauses.  See NAIC Model Laws, Regulations and Guidelines 42-3, State Adoption (current through 2014), available at  http://www.naic.org/store/free/MDL-042.pdf (last visited April 26, 2016); see also Maria O'Brien Hylton, Post-Firestone Skirmishes: The Patient Protection and Affordable Care Act, Discretionary Clauses, and Judicial Review of ERISA Plan Administrator Decisions, 2 WM. & MARY POL'Y REV. 1, 20 (2010) ("States struggle to find ways to indirectly confront perceived unfairness by plans and their insurers because ERISA's expansive preemption language expressly prohibits direct measures.").

[9] Anthem compares the statute and Certificate language here to Pain & Surgery Ambulatory Center, P.C. v. Connecticut General Life Insurance Co., No. 11-cv-5209 (KSH) (PS), 2012 WL 3781516 (D.N.J. Aug. 30, 2012) aff'd, 532 F. App'x 209 (3d Cir. 2013).  In that case, the New Jersey statute, unlike Maine's, explicitly allowed a carrier to "'include a provision stating that the carrier has the discretion to make an initial interpretation as to the terms of the policy or contract, but that such interpretation can be reversed by an internal utilization review organization, a court of law, arbitrator or administrative agency having jurisdiction.'"  Id. at *3 (quoting N.J. ADMIN. CODE § 11:4-58.3 (2012)).

There is nothing in section 4312's external review procedure to suggest that it is mandatory,[10] but Anthem contends that a beneficiary like Adele E. who chooses not to use it forfeits her right to *any* de novo review, even in court. According to Anthem: "If Plaintiff wished to have binding de novo review, she should have made a request pursuant to 24-A M.R.S.A. § 4312.  Having not done so, Anthem's decision must be afforded the discretionary authority provided under the Plan documents."  Def.'s Mot. at 6.  That conclusion is directly contrary to section 4312's language that it "may not be construed to remove or limit any legal rights or remedies of an enrollee . . . ."  24-A M.R.S.A. § 4312(9).  Moreover, it renders Maine's prohibition on discretionary clauses in section 4303(11) superfluous: under Anthem's reading of section 4312, no discretion clause in Maine can *ever* fall within the definition of a "sole or absolute" discretion clause, no matter how flagrant the language.[11]

Finally, Anthem makes an argument from the syntax of the following language in section 4303(11): a Plan or Certificate of Coverage "may not contain a provision purporting to reserve sole or absolute discretion to the carrier to interpret the terms of the contract or to provide standards of interpretation or

---

[10] See *supra* note 4.

[11] Anthem argues that its interpretation does not render section 4303(11) meaningless because the provision could still have force in a case where a claimant requests an external review, does not secure the hoped for outcome, and then proceeds to court.  See Def.'s Obj. to Pl.'s Mot. for J. on the R. at 5 (ECF No. 36) ("Def.'s Reply").  Without 4303(11)'s prohibition on "absolute" discretionary clauses, Anthem says, an "insurer could argue that its claim decision must be granted deference over the decision of the external review under Section 4312 . . . [which would be] 'inconsistent with the laws of this state'" in violation of section 4303(11).  Def.'s Reply at 5 (quoting 24-A M.R.S.A. § 4303(11)).  This argument is unpersuasive.  First, it directly contradicts the language of section 4312 that "[a]n external review decision is *binding on the carrier*."  24-A M.R.S.A. § 4312(6) (emphasis added).  Second, there is nothing in the NAIC Model Act that generated Maine's section 4303(11), nor in the legislative history of section 4303(11) itself, to suggest that such a case was the Legislature's concern.

review that are inconsistent with the laws of this State." Anthem argues that the final phrase—"that are inconsistent with the laws of this State"—modifies both the immediately preceding antecedent phrase—"to provide standards of interpretation or review"—and the more distant antecedent phrase—"to reserve sole or absolute discretion to the carrier to interpret the terms of the contract." Def.'s Mot. at 5-6; Def.'s Reply at 2-6. In other words, according to Anthem, section 4303(11) prohibits sole or absolute discretionary clauses only if they are *otherwise* inconsistent with other Maine laws. My reading of the statute does not lead me to the same conclusion. First, there is a serious grammatical problem with Anthem's reading. The clause "that are inconsistent with the laws of this State" has to have a plural antecedent noun or nominal phrase for its plural verb. "[S]tandards of interpretation or review" meets that requirement, but "a provision purporting to reserve sole or absolute discretion" does not.[12] Grammatically, therefore, Anthem's reading is incorrect.[13] Second, the Supreme Court has recently instructed us that the "rule of the last antecedent" provides that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." Lockhart v. United States, 136 S. Ct. 958, 962 (2016) (internal quotation marks omitted)); see also Gonda v. The

---

[12] Perhaps Anthem believes that the more distant plural antecedent is "the terms of the contract" (its legal memoranda do not specify the antecedent)—that the statute prohibits "a provision purporting to reserve sole or absolute discretion to the carrier to interpret the terms of the contract . . . that are inconsistent with the laws of this State." That is an unlikely reading of the statute. If a contract term is "inconsistent with the laws of this State," why would the Legislature bother to go farther and rule that the carrier cannot interpret the clause?

[13] The NAIC Model Act has the same grammatical structure as Maine's section 4303(11). Anthem has failed to point to a single instance where a court has interpreted a similar statute (one generated by the Model Act) the way it urges me to do here, and I have found none.

Permanente Med. Grp., Inc., 10 F. Supp. 3d 1091, 1093 (N.D. Cal. 2014) (interpreting similar language in California); Novak v. Life Ins. Co. of N. Am., 956 F. Supp. 2d 900, 905-06 (N.D. Ill. 2013) (interpreting similar language in Illinois). That principle of statutory construction likewise is contrary to the reading Anthem urges here.

In summary, the Maine Legislature first provided a right of independent external review to enrollees as part of "An Act to Establish a Patient's Bill of Rights" in 2000.  Evidently that was not enough and, three years later, following a national trend and the NAIC Model Act, Maine adopted legislation that prohibited outright any sole or absolute discretion provision in a policy, contract, or certificate of coverage.  Anthem's Certificate of Coverage in this case has just such a provision: it gives Anthem "*complete discretion* to determine the administration of your Benefits.  Our determination *shall be final and conclusive* and may include, *without limitation*, determination of whether the services, care, treatment, or supplies are Medically Necessary . . . ."  R. at 1622 (emphasis added).  As a result, I excise the discretion clause from Anthem's Certificate as Maine law requires[14] and, under Firestone, I review Adele E.'s benefits-denial claim de novo.

## MERITS

Adele E. has the burden of proving by a preponderance of the evidence that residential treatment for her eating disorder was within the Plan's coverage.

---

[14] According to the Maine statute, Anthem's Certificate "may not contain [such] a provision," and Anthem "may not enforce" it.  24-A M.R.S.A. § 4303(11)(A), (B).

See <u>Gent v. CUNA Mut. Ins. Soc'y</u>, 611 F.3d 79, 83 (1st Cir. 2010).  I must

"independently weigh the facts and opinions in the administrative record to

determine whether the claimant has met [her] burden . . . .'" <u>Gross v. Sun Life</u>

<u>Assurance Co. of Can.</u>, 734 F.3d 1, 17 (1st Cir. 2013) (quoting <u>Scibelli v.</u>

<u>Prudential Ins. Co. of Am.</u>, 666 F.3d 32, 40 (1st Cir. 2012)).  In doing so, I accord

the administrator's opinions and conclusions no deference or presumption of

correctness.  <u>Id</u>.  "In other words, [I] stand in the shoes of the administrator to

determine whether the administrative decision was correct."   <u>Richards v.</u>

<u>Hewlett-Packard Corp.</u>, 592 F.3d 232, 239 (1st Cir. 2010) (internal quotation

marks omitted).

 Under the terms of the Certificate (and thus the Plan), Anthem pays for

health care services that are "medically necessary."  R. at 1602.  The Certificate

defines "Medically Necessary Health Care" as:

> Health care services or products provided to a Member for
> the purpose of preventing, diagnosing or treating an illness,
> injury or disease or the symptoms of an illness, injury or
> disease in a manner that is:
> -  Consistent with generally accepted standards of
>   medical practice;
> -  Clinically appropriate in terms of type, frequency,
>   extent, site and duration;
> -  Demonstrated through scientific evidence to be
>   effective in improving health outcomes;
> -  Representative of "best practices" in the medical
>   profession; and
> -  Not primarily for the convenience of the Member or
>   Physician or other health care practitioner.

R. at 1642.  The Certificate states that Anthem uses its own medical policy "to

assist in the interpretation of Medical Necessity.  However, the Certificate of

Coverage and the Group Agreement take precedence over medical policy."  R. at 1598.

For eating disorders such as Adele E.'s, Anthem's medical policy lists "Behavioral Health Medical Necessity Criteria" ("Criteria").  R. at 1660-1753.  The Criteria state that "[w]hile the behavioral health medical necessity criteria are guidelines . . . to determine when services are medically necessary . . . the Covered Individual's contract language, including definitions and specific contract provisions/exclusions, take precedence over the criteria, and must be considered first in determining eligibility for coverage."  R. at 1662.  The Criteria also explicitly state, in boldface type, that the definition of "medically necessary" in the covered individual's Plan is to be used "for the purpose of making benefit determinations."  Id. (emphasis omitted).  Thus, according to both the Certificate and the Criteria, the Certificate's definition of "medically necessary" controls in determining whether Adele E.'s claim for continued residential treatment at RainRock qualifies for coverage.

I have consulted Adele E.'s medical records, the various medical opinions from physicians who either treated her or were hired by Anthem as consultants to review her claim, her various submissions on appeal (both internally and here), Anthem's definition of "medically necessary health care" in the Certificate, and its Behavioral Health Medical Necessity Criteria.[15]

---

[15] In its motion, Anthem categorizes what it deems Adele E.'s medically relevant events after the authorized period for benefits into months (i.e., June 18-June 30, July, August, September, and October).  However, Anthem does not argue that, if I conclude it erroneously denied Adele E. benefits on June 18, 2012, there is some date prior to October 29, 2012, when Anthem could lawfully have denied Adele E. benefits under the Plan.  See Def.'s Mot. at 15-17.

Starting with the Certificate's language, I conclude that it is apparent from the record that Adele E. sought treatment at RainRock for the "purpose of . . . diagnosing [and] treating" her eating disorder and associated illnesses.  R. at 1642.  That preamble to the "medically necessary" definition is clearly satisfied. Moreover, Anthem does not seem to dispute the third bullet-point requirement— that residential treatment for bulimia nervosa is "[d]emonstrated through scientific evidence to be effective at improving health outcomes," id.—and both the medical record itself, R. at 372-660, and the articles and APA guidelines submitted with the internal appeals, R. at 672-681, establish that this criterion for "medically necessary health care" is satisfied.  With respect to the fifth bullet-point requirement, Adele E. has proven that her treatment at RainRock was not primarily for her or her physician's or health care practitioner's convenience.  As she points out, this treatment facility in Oregon was far from both her family's home in Maine and the college that she was attending in Colorado, and she was removed from her primary care physician, nutritionist, and therapist at her college.  See R. at 375-378.  What remain then, are the first, second, and fourth bullet-point requirements for medically necessary health care under the Certificate—whether Adele E.'s continued stay at RainRock was "[c]onsistent with generally accepted standards of medical practice; [c]linically appropriate in terms of type, frequency, extent, site and duration; [and] [r]epresentative of 'best practices' in the medical profession."  R. at 1642.

My determination regarding these latter three conditions for "medically necessary" health care is informed by Anthem's Behavioral Health Medical

Necessity Criteria, which I reproduce in relevant part in Appendix A.[16]  <u>See</u> R. 1660-1753.

But first, I observe that the definition of "medically necessary" within Anthem's Criteria is substantively different from the definition within the Certificate.  <u>Compare</u> R. at 1642, <u>with</u> R. at 1662.  Unlike the Criteria's definition, the Certificate's definition, which controls, does not include any requirement that the health care services are "not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results."  R. at 1662.  Thus, any specific criterion in Anthem's Behavioral Health Medical Necessity Criteria aimed at targeting this "cost" aspect of the Criteria's definition of medically necessary is inapplicable to the question before me—whether Adele E.'s treatment was medically necessary according to the definition in the Certificate.  Further, Anthem's Criteria for residential treatment distinguish at times between qualifications for those with anorexia nervosa and those with bulimia nervosa.  As these are two different diagnoses, the portions of the Criteria related to anorexia nervosa (criterion number one and the first part of criterion number three) are inapplicable to Adele E.'s claim for treatment for bulimia nervosa.  I address the evidence with respect to each of the remaining criteria in turn.[17]

---

[16] Adele E. argues that I should not consult Anthem's Criteria because the Certificate's "definition of medical necessity controls, and . . . to the extent any guidelines should be applied, the APA Guidelines should be the Court's first choice, as it is the only generally accepted standard of medical practice before the Court."  Pl.'s Mot. at 22.  I need not address this argument because I conclude that Adele E.'s residential treatment at RainRock qualifies as "medically necessary" health care using the Anthem documents.

[17] The parties' dispute revolves around the propriety and application of the Criteria in connection with the severity of Adele E.'s illness.  Anthem has not argued that Adele E.'s failure to meet the

<u>Criterion number two</u>: The beneficiary's "[c]omorbid psychiatric disorders are controlled or stable enough for the primary focus of treatment to be the eating disorder." R. at 1691.  Adele E.'s medical records show that her secondary and tertiary diagnoses were obsessive compulsive disorder and dysthymic disorder (mood disorder), and that she also presented with major depression.  <u>See</u>, <u>e.g.</u>, R. at 65, 377-378.  There is certainly evidence in the record that she struggled with these disorders, <u>see, e.g.</u>, R. at 1225, but her physicians continually adjusted her medication to control these issues, in addition to teaching her relaxation exercises, directed at her ability to cope with these secondary issues and her emotional state surrounding her desires to purge.  R. at 1197-1236. Both her medical records and the medical opinions from her treating physicians, Dr. Joseph Arpaia (her psychiatrist and the medical director at RainRock) and Kadee Hunter (her primary therapist at RainRock), show that the primary focus throughout her stay was on treating her bulimia.  R. at 665-671, 1197-1236. Criterion number 2 is satisfied.

<u>Criteria numbers three (with respect to bulimia) and six</u>: The beneficiary's "continued purging or excessive exercising is likely to cause medical instability or dehydration that would need inpatient treatment despite receiving the same level of outpatient treatment," R. at 1691 (criterion number three), and her "[l]iving environment and support are characterized by . . . significant deficits

---

remaining criteria ("intensity of service" or "continued stay") was the basis for denying Adele E. benefits, and based on my review of the record, none of the criteria listed in those two subsections could form the basis for determining that Adele E.'s treatment at RainRock was not medically necessary.  <u>See</u> R. at 1691-1693.

. . . such that treatment at a lower level of care is unlikely to be successful," id. (criterion number six).  Dr. Arpaia's medical opinion demonstrates that Adele E. was "only able to stop purging with support before, during and after meals" and even then, on some occasions, "[s]he was still unable to stop herself from purging and self-harming."  R. at 666.  "In order for Adele to stop engaging in her purging, she required 24 hour support . . . which included bathroom supervision."  R. at 666-667.  Kadee Hunter echoed Dr. Arpaia's conclusion that Adele E. needed constant support from RainRock staff who could observe her at all times; "observations in the bathroom alone would not have been sufficient for Adele." R. at 669.  Outpatient treatment, therefore, would not suffice.  Most importantly, Dr. Arpaia concluded that "premature discharge from residential treatment would have endangered Adele's health and life."  R. at 668.  These conclusions, with their record support, demonstrate that her bulimia was likely to cause medical instability without continued residential treatment and that her living environment and support, given her geographic location away from her family and without a strong social network at college in Colorado (or any support that could provide twenty-four hour supervision), would have made treatment at a lower level of care unsuccessful.

Criterion number four: The beneficiary must have had "[s]ignificant functional disruption from usual/baseline status in at least two domains (school/work, family, activities, ADL's [activities of daily living]) related to the eating disorder."  R. at 1691.  The record demonstrates that Adele E. left college because of her eating disorder ("[she] had trouble going to classes and is binging

and purging instead.  She had trouble completing the semester due to this"),
spent the majority of the day engrossed in her eating disorder to the point where
it had "ruined her social support group," stopped skiing (an activity she used to
actively engage in) because she was too tired, and had difficulty walking because
of feeling dizzy.  R. at 365, 1070-1071, 1197-1236.  Criterion number four is
met.

Criterion number five: "Based on past treatment history, usual level of
functioning and comorbid psychiatric disorders, there is a reasonable
expectation that [the beneficiary] will benefit from this level of care."  R. at 1691.
Adele E. reported upon admission to RainRock that before being admitted she
had been hospitalized for dehydration and stomach pain, had a hard time
realizing how sick she was, and was encouraged to seek residential treatment by
her therapist at school.  R. at 377-378, 1070-1071, 1195.  She also stated upon
admission that she sought treatment because she wanted to get better.  R. at
375.  Her medical records thereafter are full of references to her engagement in
treatment, even when she was frustrated or upset by her treatment plan; honest
recitation of any eating disordered behavior and attendant emotions; and
willingness to be held accountable for her actions.  R. 685, 1197-1236.  I
conclude that there was not only "a reasonable expectation that [she] will benefit
from this level of care," but that the record demonstrates that she did, in fact,
benefit from her continued residential treatment at RainRock.

In sum, Adele E.'s treating health care providers, Dr. Arpaia and Kadee
Hunter, along with her medical records, lead me to conclude that she has met

her burden of proving that she is entitled to the benefits she claimed under the Plan. The evidence demonstrates that her residential treatment at RainRock from May 29, 2012 to October 29, 2012, qualified as "medically necessary health care"—using Anthem's Behavioral Health Medical Necessity Criteria to inform that decision—under the Certificate of Coverage, and thus, the Plan. I do not defer blindly to the plaintiff's treating health care practitioners. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician."); Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 526 (1st Cir. 2005) ("[T]he opinion of the claimant's treating physician . . . is not entitled to special deference.").[18] However, Anthem's consulting physicians who rejected her claim are unpersuasive.[19] Thus, although I do not

---

[18] I also understand that there may be some economic self-interest in their supporting Adele E.'s claim for coverage.

[19] Neither Dr. Earnest Raba, the first consulting physician who reviewed Adele E's claim, nor Dr. Michael Cesta, the consulting physician responsible for overseeing her first internal appeal from the denial of benefits, even referenced the definition of medical necessity from the Certificate of Coverage or provided the reasons why she failed to meet that definition. See R. at 365-368, 686-688. Further, Dr. Raba, after chronologically summarizing the plaintiff's medical record (which contained, among other things, references to the plaintiff's passive suicidal ideation; the frequency of the plaintiff's vomiting; her self-injurious behavior; her strong desires to purge, engage in self-harm, and exercise; and her severe body image distress), mischaracterized a telephone conversation that he had with Dr. Arpaia. Compare R. at 368 (Dr. Raba's recitation of the conversation), with R. at 666-667 (Dr. Arpaia's response to Dr. Raba's recitation). Dr. Cesta's report and conclusions are not persuasive because he erroneously stated that "[t]here is no indication that [Adele E.] was engaging in eating disordered behavior during the course of her treatment subsequent the last authorized day" and that she was "not displaying any violence directed at herself." R. at 686. Even a cursory look at the medical records exposes the inaccuracies of these conclusions. The plaintiff clearly engaged in "eating disordered behavior," including bingeing, purging, and self-injurious behavior (in addition to severe desires to carry out the same) well after the authorized period of treatment. See R. at 519-660. Dr. Susan Rosenfeld, the consulting physician responsible for overseeing the second internal appeal, did in fact reference the Certificate's definition of medically necessary, but her statements are wholly conclusory: she does not provide a rationale for her decision, but merely provides a one-word response to whether the treatment was medically necessary and then recites events in the medical record. R. at 1031-1035.

automatically defer to the opinions of the treating health care practitioners, I credit and find their conclusions persuasive compared to the short shrift given by Anthem's consulting physicians.[20]

### ADDITIONAL REMEDIES

Adele E. requested—without elaboration—attorney fees, costs, and pre- and postjudgment interest in her complaint and motion.  Anthem did not address these requests in its legal memoranda.

ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  29 U.S.C.A. § 1132(g)(1).  In deciding whether to award such fees, courts consider the following five factors:

> (1) the degree of culpability or bad faith attributable to the losing party; (2) the depth of the losing party's pocket, *i.e.,* his or her capacity to pay an award; (3) the extent (if at all) to which such an award would deter other persons acting under similar circumstances; (4) the benefit (if any) that the successful suit confers on plan participants or beneficiaries generally; and (5) the relative merit of the parties' positions.

Gross v. Sun Life Assurance Co. of Can., 763 F.3d 73, 83 (1st Cir. 2014), cert. denied, 135 S. Ct. 1477 (2015) (citing Cottrill v. Sparrow, Johnson & Ursillo, Inc., 100 F.3d 220, 225 (1st Cir. 1996) abrogated by Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242 (2010)).  "The list is exemplary rather than exclusive, and indeed, not every factor in the list must be considered in every case.  No single factor is dispositive."  Id. (internal quotation marks and citations omitted).  Nevertheless, I address each item on the list.

---

[20] I recognize that I reach a different conclusion on the merits than the Tenth Circuit did in a similar case, M.K. v. Visa Cigna Network POS Plan, 628 F. App'x 585, 597 (10th Cir. 2015).  In that case, however, the Tenth Circuit was applying a deferential standard of review to the administrator's decision, whereas I am applying de novo review.  See id. at 591.

(1) Anthem's culpability in this benefits denial is not immediately clear from the administrative record, and thus it does not affect my conclusion.

(2) Anthem has the capacity to pay the plaintiff's attorney fees and costs.

(3) An award of attorney fees and costs in this case is an important deterrent measure: first, because of the limited remedy available to ERISA plaintiffs like Adele E., insurers should not have an incentive to deny meritorious claims with the hope that some claimants will not sue; and "second, because an award of attorney fees ensures that attorneys continue to take on ERISA cases in which the potential monetary award may be limited." Black v. Unum Life Ins. Co. of Am., 324 F. Supp. 2d 206, 219 (D. Me. 2004).

(4) The success of this suit confers a benefit on plan participants generally because of my determination that discretionary clauses like the one in Anthem's Certificate of Coverage are invalid under Maine law, and thus review in federal court is de novo.

(5) After a full investigation into how these Maine laws came to pass, I conclude that Anthem was clearly wrong on the applicable standard of review. I also conclude that Anthem had the weaker case on the merits.

Having weighed these factors, I conclude that an award of attorney fees and costs is appropriate in this case; it "ensures that [the] [p]laintiff's victory is not merely a Pyrrhic one." Black, 324 F. Supp. 2d at 220. The plaintiff's counsel shall file a motion for attorney fees following the procedures set forth in Federal Rule of Civil Procedure 54(d) and Local Rule 54.2.

As for Adele E.'s request for prejudgment interest, "[i]n ERISA cases, the district court has broad discretion both to determine whether to award prejudgment interest and to determine the parameters of such an award." Radford Trust v. First Unum Life Ins. Co. of Am., 491 F.3d 21, 23-24 (1st Cir. 2007); see Janeiro v. Urological Surgery Prof'l Ass'n, 457 F.3d 130, 145 (1st Cir. 2006) ("Although there is no specific statutory provision for prejudgment interest in most ERISA cases, such awards . . . are available, but not obligatory." (internal quotation marks omitted)).  Prejudgment interest may be awarded "to ensure that an injured party is fully compensated for its loss."  Milwaukee v. Cement Div., Nat'l Gypsum Co., 515 U.S. 189, 195 (1995).  However, prejudgment interest "is not granted according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness." Janeiro, 457 F.3d at 145 (internal quotation marks omitted).

Here, however, the need for prejudgment interest is undeveloped; Adele E. did not elaborate as to why I should award prejudgment interest, and Anthem did not respond to Adele E.'s request.  I do not even know the amount that Anthem must pay for the RainRock residential treatment.  I direct the parties by May 19, 2016, (1) to jointly submit a calculation of the benefits owed to Adele E. or, if they cannot agree on a figure, to submit calculations separately with the parties' respective explanations; and (2) submit further briefing elaborating on

why I should or should not award prejudgment interest to the plaintiff and, if I do award prejudgment interest, the interest rate that should apply.[21]

### CONCLUSION

For the reasons explained above, it is **ORDERED** as follows:

1.     The plaintiff Adele E.'s Cross-Motion for Judgment on the Administrative Record is **GRANTED**;

2.     The defendant Anthem Blue Cross and Blue Shield's Cross-Motion for Judgment on the Administrative Record is **DENIED**;

3.     The plaintiff's attorney shall file a motion for costs and attorney fees pursuant to Fed. R. Civ. P. 54(d) and Local Rule 54.2, to allow the court to determine the appropriate fee;

4.     The parties shall jointly submit a calculation of the benefits owed to the plaintiff Adele E., or, if the parties cannot agree on a figure, submit calculations separately with the parties' respective arguments no later than May 19, 2016;

5.     The parties shall submit further briefing on the issue of prejudgment interest and, if awarded, the rate to be applied no later than May 19, 2016;

---

[21] Although the availability of prejudgment interest is clear, the appropriate rate of interest is not.  Generally, "federal law governs the scope of remedies available when a claim arises under a federal statute, and this doctrine extends to the rate of prejudgment interest."  Cottrill, 100 F.3d at 224 (citation omitted).  ERISA is silent with regard to the prejudgment interest rate.  In such a circumstance, "courts have discretion to select an appropriate rate," and they should be guided by principles of equity.  Id. at 224–25.

The complaint also sought postjudgment interest.  See Compl. at 5 (ECF No. 1).  Postjudgment interest is statutorily awarded to the plaintiff at the federal rate, pursuant to 28 U.S.C.A. § 1961(a) (2006 & Supp. 2015).  Postjudgment interest accrues as of the date that the amount of damages is resolved.  Radford Trust v. First Unum Life Ins. Co. of Am., 491 F.3d 21, 24 (1st Cir. 2007).  Therefore, postjudgment interest will statutorily accrue after the amount Anthem owes Adele E. for wrongfully denying her benefits under the Plan is confirmed and the court has entered judgment accordingly.

6.     The Clerk shall not enter judgment until after the parties have submitted their respective filings regarding the final benefit calculation and the court has decided on whether to award the plaintiff prejudgment interest.

**SO ORDERED.**

**DATED THIS 28TH DAY OF APRIL, 2016**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

<u>**Appendix A**</u>

Anthem's "Behavioral Health Medical Necessity Criteria" ("Criteria") state

that

> [w]hile the behavioral health and medical necessity criteria are guidelines used by utilization review and care management staff (licensed registered nurses or licensed independent behavioral health practitioners, and physicians) to determine when services are medically necessary, federal and State law, as well as the Covered Individual's contract language, including definitions and specific contract provisions/exclusions, take precedence over the criteria, and must be considered first in determining eligibility for coverage.
>
> . . .
>
> **NOTE: PLEASE SEE THE DEFINITION OF "MEDICALLY NECESSARY" OR "MEDICAL NECESSITY" IN THE COVERED INDIVIDUAL'S PLAN DOCUMENT FOR THE PURPOSE OF MAKING BENEFIT DETERMINATIONS.**

R. at 1662.

With respect to the residential treatment center criteria, the Criteria state,

in relevant part:[22]

**EATING DISORDER
RESIDENTIAL TREATMENT CENTER (RTC)**

*Admission Criteria*

SEVERITY OF ILLNESS (SI)
Clinical Findings: Current DSM Axis I or ICD-9 Eating Disorder Diagnosis that is consistent with symptoms.

---

[22] The Criteria detail two substantially similar but different eating disorder residential treatment center guideline tables—one for residential treatment care (RTC) and another for residential treatment center (RTC) without 24-hour nursing. R. at 1691, 1694. It is unclear from the record which facility RainRock falls into, and Anthem seems to rely on the admission criteria from RTC while citing to the table for RTC without 24-hour nursing. <u>See</u> Def.'s Mot. at 27-29. Because Anthem substantively relies on the RTC table and the plaintiff does not argue any error on Anthem's reliance based on the wrong category of facility, I look to the RTC table in the Criteria.

All services must meet the definition of medical necessity in the Covered Individual's plan Document.

*Must have all of the following to qualify:*

1. If Anorexia Nervosa and weight restoration is goal, BMI between 15-18 or weight between 75%-85% of estimated ideal weight range and no signs or symptoms of acute medical instability that would require daily physician evaluation.
2. Comorbid psychiatric disorders are controlled or stable enough for the primary focus of treatment to be the eating disorder.
3. For Anorexia Nervosa, continued restricting and purging is leading to weight loss that is likely to lead to medical instability and need for inpatient treatment despite receiving structured outpatient ED treatment (IOP or PHP, or 2-3 times a week OP treatment involving an ED BH clinician, nutritionist and a qualified physician where intensive services not geographically available) with the likelihood that residential treatment will result in improvement; for Bulimia Nervosa, continued purging or excessive exercising is likely to cause medical instability or dehydration that would need inpatient treatment despite receiving the same level of outpatient treatment described above; or for either condition, the Covered Individual has had multiple inpatient admissions within the past six (6) months with a failure to stabilize with outpatient aftercare.
4. Significant functional disruption from usual/baseline status in at least two domains (school/work, family, activities, ADL's) related to the eating disorder.
5. Based on past treatment history, usual level of functioning and comorbid psychiatric disorders, there is a reasonable expectation that the Covered Individual will benefit from this level of care.
6. Living environment and support are characterized by either significant deficits or significant conflict or problems that would undermine goals of treatment such that treatment at a lower level of care is unlikely to be successful, and this can potentially be improved with treatment.

. . .

ii

*Continued Stay Criteria (CS)*

*[In addition to meeting the above, must] have the following to qualify:*

1. If low body weight was a reason for admission, target weight for safe treatment on an outpatient basis listed and weight gain of 1-2 pounds per week documents.
2. Progress toward treatment goal is documented as shown by motivation on the part of the Covered Individual and family, adherence to treatment recommendations including weight gain and acceptance of recommended dietary caloric intake if low body weight was a reason for admission and control of binging and purging or non-purging bulimic symptoms, but treatment goals that would allow continued treatment at a lower level of care have not been achieved; if progress not achieved than the treatment plan has been adjusted in a manner that is likely to achieve progress toward meeting treatment goals or treatment goals have been adjusted.

R. at 1691-1693.